UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

In re:                                                    Case No.: 17-12413-13

JASON J. KRUS and
TRINA B. KRUS,

Debtors.

## DECISION

Debtors Jason and Trina Krus filed their Chapter 13 petition on July 7,

2017. Debtors filed a Chapter 13 Plan, and Creditor Dells Land & Cattle

Company II, LLC ("DLCC") objected.

## FACTS

The parties have stipulated to the following facts. On June 30, 2016,

Debtors and DLCC executed a Land Contract that is secured by real estate

located at 1712-1714 9th Avenue, Wisconsin Dells, Wisconsin 53965 (the

"Property"). The Property is a duplex. Debtors occupy one unit and rent out the

other. Debtors generate income from the rented unit in the amount of $1,425

per month.

Under the Land Contract, Debtors paid $5,000 upon execution and were

required to pay the balance of $290,000 over a period ending on July 1, 2019.

The Land Contract required Debtor to initially make $2,000 per month

principal-only payments to Bank First National to satisfy an underlying note

between DLCC and Bank First National. Debtors were also required to make

escrow payments to Bank First National in the amount of $520 per month over

the entire term of the note. Starting August 1, 2017, Debtors were required to make monthly principal and interest payments computed at an annual rate of 1.75%, compounded monthly. Those payments were also to be made to Bank First National. On August 1, 2018, the principal and interest payment will adjust to an interest rate of 3.5%, compounded monthly. The Land Contract has a maturity date of July 1, 2019, at which time a balloon payment would be due. The current balance due is $278,000.

On the Petition Date, Debtors were in arrears in the amount of $15,120. Debtor's Plan proposes payment of the arrearage of $19,000 over 60 months without interest. It further provides that the regular $2,520 monthly payments will be made outside of the Plan. There will be a balloon payment due on the 60th month for any unpaid principal, interest or other charges.

## DISCUSSION

DLCC raises two arguments under which it claims that confirmation of Debtors' Plan must be denied. First, it argues the Land Contract is secured by Debtors' principal residence. Therefore, it asserts, the Plan may not modify DLCC's rights pursuant to section 1322(b)(2). Second, it argues the proposed balloon payment on the Land Contract renders the Plan unfeasible.

### 1. *Anti-modification of claim secured by principal residence*

Section 1322(b)(2) provides a plan may "modify the rights of holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence." A Chapter 13 debtor is

therefore prohibited from modifying the rights of a claimholder whose interest is secured exclusively by a principal residence.

The issue in this case is that the Property is mixed use—one half is Debtors' principal residence, and the other half is an income-generating rental property. Though countless courts have addressed this issue, there is no controlling decision from the Seventh Circuit.

Overwhelmingly, courts have held that claims secured by mixed-use property are not "secured by a debtor's principal residence" for purposes of section 1322.[1] Their treatment, therefore, is subject to modification through a Chapter 13 plan. The Third Circuit has reasoned that the use of the word "is" in the statute "means that the real property that secures the mortgage must *be only* the debtor's principal residence in order for the anti-modification provision to apply." *Scarborough v. Chase Manhattan Mortg. Corp. (In re Scarborough)*, 461 F.3d 406, 411 (3d Cir. 2006) (emphasis in original). Where, as here, Debtors use part of their property to generate income, it would no longer qualify as a principal residence under the language in the Code.

---

[1] *Adebanjo v. Dime Sav. Bank, FSB (In re Adebanjo)*, 165 B.R. 98, 103 (Bankr. D. Conn. 1994) ("Courts have generally held that a claim secured by property which has 'some inherent income-producing power' is not protected by § 1322(b)(2), even if the debtor also resides on a portion of the property."); *In re Moorer*, 544 B.R. 702, 705 (Bankr. M.D. Ala. 2016) (holding property containing a home and cattle pasture is not a principal residence); *In re McVay*, 150 B.R. 254, 257 (Bankr. D. Or. 1993) (holding a home that was also a bed and breakfast was not a principal residence because it was mostly used for the B&B).

A few courts have acknowledged the language in section 1322 is ambiguous as applied to mixed-use property subject to a residential mortgage. At least one court, after remarking that the statutory language in inconclusive, simply rejected the view propounded by DLCC here and followed the rule accepted by the Third Circuit. *In re Abrego*, 506 B.R. 509, 515 (Bankr. N.D. Ill. 2014). Others have adopted a case-by-case approach taking into account the totality of the circumstances surrounding the land and the mortgage transaction. *Brunson v. Wendover Funding (In re Brunson)*, 201 B.R. 351, 353 (Bankr. W.D.N.Y. 1996). *See also Litton Loan Servicing, LP v. Beamon*, 298 B.R. 508, 512 (N.D.N.Y. 2003). Those courts look to the intent of the parties to determine whether they "intended the mortgage in question to be primarily residential versus primarily commercial in nature." *Id.*

The Court adopts the majority rule. First, to hold that mixed-use property may sometimes qualify as a "principal residence" could lead to an absurd result. As other courts have noted, "[i]t is unlikely Congress intended the anti-modification provision to reach a 100–unit apartment complex simply because the debtor lives in one of the units. Limiting the anti-modification provision to single-family dwellings creates a more easily administered test." *Lomas Mortg., Inc. v. Louis*, 82 F.3d 1, 6 (1st Cir. 1996). *See also Abrego*, 506 B.R. at 515.

Moreover, the majority rule more closely matches the language in the statute and lends itself to judicial economy. Section 1322 controls "property that *is* the debtor's principal residence"—not property that includes or contains

4

the debtor's principal residence. If the Court adopted a totality of the circumstances approach, it would endeavor to reconstruct a factual history from contracts and other available evidence to divine whether the parties intended the contract to be 51% residential or 51% commercial. Meanwhile, the majority interpretation springs directly from the language in the statute and provides a bright line for settling 1322 disputes on mixed-use property. And ultimately, "[e]ven if the Court does not agree with all of the possible outcomes produced by the statutory language, it is Congress, not this Court, that must repair any problems with the Code." *Abrego*, 506 B.R. at 515.

Even if the Court chose to use a balancing test, the Property should be characterized as commercial. Ms. Krus has been employed since June 2016 as a rental manager. She works for Krus and Sias, LLC, which was formed in June 2016 and in which the Debtors are members. The LLC was formed in the same month Debtors executed the Land Contract. Though it is not totally clear, the record suggests Debtors formed the LLC with the express purpose of using it to rent out the second apartment. It is virtually indisputable there was at least some commercial intent at the time the Land Contract was signed. Debtors appear to have formed an LLC with the sole purpose of starting a commercial housing rental service. Ms. Krus's income flows from the LLC and the amount of income closely matches that which Debtors charge in rent on the second unit.

DLCC requests this Court adopt the case-by-case approach, but it does not offer any justification for why this property should be considered mostly

residential. DLCC cites to *In re Wages*, a case that addressed a somewhat
similar factual scenario in the context of a Chapter 11. 479 B.R. 575, 580
(Bankr. D. Idaho 2012), *aff'd*, 508 B.R. 161 (B.A.P. 9th Cir. 2014). There, the
property at issue was an 11-acre parcel of land the debtor used as his
residence and in the operation of his trucking business. The court declined to
follow the "hyperliteral" interpretation of the term "principal residence" and
held the anti-modification provision in section 1123(b) applied. Relevant to the
instant case, the *Wages* court observed "the anti-modification provision's
practical and policy considerations as applied to multi-family dwellings are not
the same as those applicable to a trucking business." *Id.* at 582. By its own
reasoning, *Wages* is not applicable here.

The anti-modification provision does not apply to Debtors' Plan. As such,
the Plan may modify DLCC's rights.

   *2. Feasibility*

DLCC has also objected on the grounds the Plan is not feasible. Debtors
bear the burden of proving their Plan meets the requirements of section
1325(a), including feasibility. DLCC argues the Plan is not feasible because it
proposes a balloon payment at the end of the 60-month term on DLCC's claim.

In considering balloon payments in a Chapter 13, other courts have
ruled "debtors must show by definite and credible evidence that they will have
the financial ability to make the balloon payment." *In re Fantasia*, 211 B.R.
420, 423 (B.A.P. 1st Cir. 1997); *see also In re Wagner*, 259 B.R. 694, 700
(B.A.P. 8th Cir. 2001) (holding a balloon payment is suspect "[u]nless the

6

debtor shows proof that he will be able to pay the balloon payment at the time it comes due"). When considering feasibility of plans with balloon payments, other courts have considered the following factors:

1) the equity in the property at the time of filing;

2) the future earning capacity of the debtor;

3) the future disposable income of the debtor;

4) whether the plan provides for the payment of interest to the secured creditor over the life of the plan;

5) whether the plan provides for payment of recurring charges against the property, including insurance, local property taxes and utility charges; and

6) whether the plan provides for substantial payments to the secured creditor which will significantly reduce the debt and enhance the prospects for refinancing at the end of the plan.

*Id.*

Debtors have no equity in the property. They agreed they owe about $290,000 and they value the Property at $244,000. Debtors' combined monthly income is $7,358.32 (ECF No. 32, p. 3).

Per DLCC's proof of claim, Debtors' monthly payment consists of $2,000 principal and interest at 1.75% interest, compounded monthly, plus $520 or more for real estate taxes. In August 2018, the interest rate and monthly payment will increase. Debtors' household expenses are about $3,668. Between household expenses and payments to DLCC, Debtors will pay $6,188 per month before Plan payments. With Plan payments, Debtors will spend $7,358, leaving $.32 left over to contribute to savings.

Debtors' payments to DLCC outside of the Plan will be approximately $120,000 in principal and interest payments. Assuming all payments are fully and timely made, without accounting for interest Debtors will owe in excess of $170,000 at the end of the Plan.

Debtors have no room in their budget for any savings. Based on the schedules and the planned payments, they will barely break even over the course of their Plan. If they manage to save anything in the next five years, it will be minimal. If Debtors expect to make a balloon payment, they will need to find alternate financing. No evidence of future earning capacity or disposable income has been presented.

Debtors correctly note they have demonstrated a reasonable likelihood they will make the current regular monthly payments. Yet they claim without support they "should be afforded the opportunity to find alternate financing to make the balloon payment." Debtors have not submitted any evidence that would suggest they have a relationship with a bank that would be willing to provide refinancing. Debtors may argue by the end of their Plan a bank would have five years of payment history to judge their financial reliability. But that would "not make the Debtor's plan less speculative today." *In re Harris*, 199 B.R. 434, 436 (Bankr. D.N.H. 1996). The Court does not have even a suggestion Debtors would be capable of refinancing, let alone "definite and credible evidence" that alternate financing will be available. *Fantasia*, 211 B.R. at 423. For that reason, the Court cannot find that Debtors will likely make all the proposed payments, and the Plan is therefore not feasible.

8

## CONCLUSION

Debtors' Plan may modify DLCC's rights, but the proposed Plan is not feasible, and the Court cannot confirm it.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated:  February 21, 2018

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge